549 So.2d 1325 (1989)
Billy Dean GARRETT
v.
STATE of Mississippi.
No. 07-KA-58620.
Supreme Court of Mississippi.
September 27, 1989.
Roger F. Wicker, Sparks Wicker & Colburn, Tupelo, for appellant.
Edwin Lloyd Pittman, Atty. Gen., elected Supreme Court Justice January 3, 1989, Mike C. Moore, Atty. Gen., John R. Henry, Jr., Sp. Ass't. Atty. Gen., Jackson, for appellee.
*1326 Before HAWKINS, P.J., and PRATHER and BLASS, JJ.
PRATHER, Justice, for the Court:
Billy Dean Garrett was indicted for murder, but convicted of manslaughter in the Circuit Court of Lee County, Mississippi. He was sentenced to a term of twenty years in the custody of the Mississippi Department of Corrections. From that conviction and sentence Garrett appeals, assigning as error the following:
(1) The lower court erred in failing to grant appellant's motion for a new trial, upon discovery that the jury had inadvertently received information concerning appellant's having taken a polygraph examination.
(2) The verdict of the jury was contrary to the overwhelming weight of the evidence.

I.
The defendant, Billy Dean Garrett, (Garrett) age thirty years at the time of trial, was a maintenance man and carpenter, with no prior criminal record. He had completed studies for the General Equivalency Degree and at the times in question here was living with Glenda Thomas, age thirty-three, and three of her four children, i.e., Charmin Thomas, (ten years old at the time of her mother's death) and Calvin Thomas, (twelve years old at his mother's death). Garrett was employed as a "bouncer" at the Showboat Lounge and Glenda, on the night in question, was working as a waitress. The account of the events that transpired after their return home in the early morning hours of August 11, 1983, was contradictory.

II.
Glenda Thomas was found by her twelve year old son Calvin in the bedroom of a pistol wound to her chest; Calvin, went next door at approximately 8:20 a.m. and reported to a neighbor his mother shot herself. When the neighbor, James Laney, came into Thomas' house, he saw Billy Dean Garrett, the decedent's housemate, sitting on a couch in the den. Laney found Thomas in the bedroom with a .25 caliber handgun lying on the floor between her knees and feet.
Later, before the police arrived, Laney noticed that the pistol was missing from the bedroom. He asked Calvin what had become of it. Calvin told him that he had removed the gun from the bedroom and put it in Garrett's truck. Calvin later retrieved the gun and gave it to the police.
Bobby Stubbs, a patrolman with the Tupelo Police Department, received a call to investigate this shooting and was the first police officer to arrive. He obtained a .25 caliber pistol from Calvin, unloaded it and gave it to Chief of Police Crider.
Stubbs talked to Garrett, who told him that (1) he and Thomas got into an argument at approximately 1:00 a.m.; (2) he left the house and spent the night in the truck outside; (3) he returned to the house between 6:30 and 7:00 a.m.; and, (4) he did not go into the bedroom between the time he left the house for the truck and the time he returned to the house.
Detective Harold Chaffin of the Tupelo Police Department also received a call to investigate Thomas' death. He found the body of Thomas lying on the floor at the end of the bed. After viewing the body, Chaffin went into the living room and spoke to Garrett, whom he had known for over twenty years.
Garrett told Chaffin that he had been living at Thomas' residence and that he and Thomas worked for the same business, the Showboat Lounge. On the night before, the couple had gotten off work at approximately 12:00 a.m. and had come home. They had been in an on-going argument about an affair Garrett had had at one time with another woman. The argument continued when they arrived at Thomas' house. The result of the argument was that Garrett spent the night in his truck. Thomas went to her bedroom, and Garrett told Chaffin that was the last he saw of her that night. At about 7:00 a.m. Garrett returned to the house, ate breakfast and then watched television with Thomas' youngest daughter Charmin, age ten, until *1327 about 11:00 a.m. At that time, Calvin went to wake his mother and found her dead in the bedroom. Garrett was not in custody or under arrest during this conversation with Chaffin.
The following day, August 12, 1983, the officers received a call from Dr. Walker, a pathologist at the medical center. He requested someone from the police department attend the autopsy on Thomas. During the autopsy, Dr. Walker showed the officers bruises on the arms, elbows and forearms on Thomas. He further showed them a number of contusions appearing on the inside of the scalp. Chief Crider then ordered an investigation into Thomas' death. The police returned to Thomas' house and found a shell casing in the far corner of the bedroom, not far from where Thomas' body had been located. No testing for gun powder was made of Thomas' nor the defendant's hands.
Investigator Johnny Ash and Lieutenant Mickey Loden of the Tupelo Police Department interviewed Garrett from about 2:00 p.m. until about 6:30 p.m. on August 12, 1983, at the Police Department. Garrett was informed of his Miranda rights, which he waived. During the course of the interview, Garrett consented to a polygraph examination which was administered by Detective Crocker.
Garrett gave a statement which was taken down and then typed for his signature. After reading the statement Garrett signed it. The gist of the statement was that Garrett had entered Thomas' bedroom and had seen her with a gun, that he struggled to wrestle the gun away from her, and that it accidentally fired.
The signed statement was one of three versions of the incident related by Garrett. In the first version, Garrett stated that during the fight he went out to the yard of the house. He saw Thomas come out to the truck, but did not see Thomas shot because he spent the night in the truck. The other version was the same except that he spent the night under a pine tree.
Garrett contends that he at first insisted on telling the true facts during the course of the interview, but that the police continued to insist that his story was not acceptable. He stated that he finally gave a statement along the lines suggested by the police after he realized that the police were not going to leave him alone until he changed his story. Garrett's theory of the events of this shooting was that Thomas had been depressed and suicidal and had shot herself.
Dr. Walker, the pathologist who performed the autopsy on Thomas, testified as to the condition of Thomas' body and cause of death. During the course of his examination he found a tampon in Thomas' vagina and stated that statistically suicide among women is more prevalent during menstruation and that nothing in his examination ruled out the possibility that the victim committed suicide.
John Allen, a forensic scientist with a specialty in firearm examination with the Mississippi Crime Lab, identified the cartridge and projectile as having been fired from the handgun found in Thomas' house.
He also testified to the residue found on Thomas' blouse. From test firing the weapon, he determined the pattern of residue found on the blouse would be produced when the weapon was fired at, or near, contact range. In addition, the loud report a pistol makes when fired could be muffled if fired at contact range. Dr. Walker, the pathologist, testified that the bullet entry was on the victim's left anterior chest over the fourth rib. The path of the bullet took a downward course at the level of the seventh rib and was removed from the soft tissue in the left chest wall at what is called the posterior axillary line. Glenda Thomas was righthanded.
Charmin Michelle Thomas, the decedent's ten year old daughter, testified that in the early morning of August 11, she awakened to the sound of an argument between Garrett and her mother and saw Garrett push her mother down and hit her. Charmin went to awaken her brothers, Calvin, age 12, and Danny, age 8, and when she returned, she saw her mother with a knife and Garrett putting brass knuckles on his hands.
*1328 Charmin could not tell whether Garrett hit her mother with the brass knuckles or just shoved her in the head with them. When Garrett saw Charmin, he put the knuckles down and walked out of the house to the truck. Thomas followed him. Garrett came back into the house with Thomas and the fighting began again. Garrett left to spend the night in the truck. Thomas went out to the truck and asked him if he wanted to sleep inside. Thomas came back into the house, sat on her bed and wept. She told Charmin to go to bed.
Charmin said Garrett came into the house at about 5:00 a.m. and shut her door. He then used the bathroom and went back to the truck. Charmin did not see Thomas with a gun; she did not see Garrett go into Thomas' room; and she did not hear a gunshot during the night.
James Earl Thomas, the decedent's seventeen year old son who lived with his father, stated that around June 15, 1983, Garrett and Thomas had a late night argument about a woman. James heard the sound of a slap, and then another. He heard Garrett tell Thomas that if she hit him again he would shoot her where she stood.
Denise Garrett, the accused's sister-in-law, testified that Thomas confided that her menstrual cycle was in disorder and that she was worried she was going to have to have a hysterectomy performed. This problem engendered talk of suicide by Thomas. In February, 1983, Thomas supposedly told Denise that she was attempting to commit suicide but that the attempt failed due to Garrett's (the accused) intervention. Thomas told Denise that she was afraid Garrett would look to other women as a result of her incapacity.
On cross-examination, Denise admitted she saw bruises on Thomas when she visited. In addition, Thomas told Denise on the Sunday prior to her death that she was thinking of leaving Garrett.
Garrett also described the alleged suicide attempt by Thomas. He further testified that on August 11, 1983, he and Thomas argued and that the argument lasted until they went to work at about 7:00 p.m. The couple did not talk during work and the argument resumed when they got off work at about 12:30 p.m. Both parties had been drinking alcoholic beverages.
The argument continued when they got home. Thomas had a knife, and the couple ended up on the floor fighting over the knife. Garrett denied wearing or even owning brass knuckles. He did not know if he rammed her head against a wall. Garrett succeeded in getting the knife from Thomas.
Garrett then left the house and sat by a pine tree. He saw Thomas go to the truck and open the passenger door. Thomas returned to the house and Garrett got a piece of foam and slept in the back of the truck. Garrett returned to the house at about 7:30 a.m.
Garrett denied wrestling with Thomas for the gun on the night of her death. He contends he signed the police statement only because he felt threatened or scared. He stated he did not shoot Thomas and that he was not in her bedroom when she died. On cross-examination, he admitted that he did see Thomas in her bedroom before she died; he took his jeans off and slapped her with them.
Garrett was convicted of manslaughter by the jury and sentenced to twenty years in the custody of the Mississippi Department of Corrections.

III.

DID THE TRIAL COURT ERR IN FAILING TO GRANT GARRETT'S MOTION FOR A NEW TRIAL WHICH ALLEGED THE JURY CONSIDERED A DOCUMENT NOT INTRODUCED INTO EVIDENCE WHICH SUGGESTED GARRETT TOOK A POLYGRAPH TEST?
Several days after the trial of this case, the trial judge received information that the State's Exhibit No. 6 for identification, the polygraph consent form, may have gone to the jury room during the jury deliberation. The court called together the clerk, State's attorneys and defense attorneys and requested the clerk to obtain the *1329 envelope from the vault containing exhibits. When opened, the exhibit envelope contained, among other exhibits, State's Exhibit No. 6 for identification.
State's Exhibit No. 6 for Identification is a request for and a consent to a release signed by Garrett for the Tupelo Police Department for a polygraph examination. The document does not indicate whether such an examination was given or, if so, what the results of the examination were. This document was offered into evidence and marked for identification only, but was not introduced into evidence.
On December 13, 1985, Garrett's motion for a new trial came before the trial court for a hearing. The State and the defense were each permitted to subpoena one of the jurors who decided the case; the trial court also subpoenaed one juror.
James W. Evans was the first former juror called to testify. While Evans could not specifically identify State's Exhibit No. 6 for identification as the document which went back to the jury room, he did testify that the jury received information concerning a polygraph. During the hearing, Mr. Evans was presented with State's Exhibit No. 7 and State's Exhibit No. 6 for identification and made the following statement:
I remember a paper of this type with some parts cut out on it that he had signed. And that was the first word of polygraph that I had heard. And, I thought to myself, just to be honest with you, I had had a question in my mind whether or not, you know, he had stayed at the police station for a long period; and, I  it was just me, I didn't even mention this. I thought to myself, I said, "Well, that's the reason."
On cross-examination Evans testified that the polygraph wasn't discussed "that much in detail, but it was discussed some." The court asked of Evans if the jurors reached a conclusion as to whether or not the defendant took the test, to which Evans responded, "I believe we did." The defendant objected to the court's inquiry.
The next former juror to be called was Harold Green. Part of his testimony was as follows:
Q. Well, let me ask you this, at some point during your jury deliberations did you and your fellow jurors become aware that a polygraph test had been administered to Mr. Garrett, that is, a polygraph or lie detector test?
A. Yes, sir, I do.
Q. At what point did you all become aware of this?
A. Really, I don't know to be honest with you.
Q. O.K. Well, I realize it has now been ten months or so. But, you can say at some point in the deliberation you all did learn that he had taken a polygraph test?
A. Yes, sir. We did.
Green did not recall ever seeing State's Exhibit No. 6 for identification, or any paper in the jury room concerning a polygraph test.
Q. But, you can say for sure that at some point you and the jury members concluded that a polygraph or lie detector test had been given?
A. Yes, sir.
Q. If the Court will indulge me for one moment?
BY JUDGE RUSSELL: Yes, sir.
(MR. WICKER CONFERRED WITH MR. THORNE.)
Q. Do you recall how the subject came up or how you came to that conclusion? What was it that 
BY MR. BOWEN: Objection again, Your Honor.
BY JUDGE RUSSELL: Go ahead, I am going to overrule the objection. You may answer the question if you recall.
Q. What it was that caused you all to know this?
A. Well, I don't really know.
Q. You couldn't say for certain what it was that prompted this discussion about it, the polygraph?
A. No, sir, I can't. I can not.
Q. All right. Sir, do you remember looking through various documents when you went in to deliberate?
A. Yes, sir, I do.

*1330 Q. Do you remember seeing any paper in there that mentioned a polygraph or a lie detector test?
A. No, sir, I don't.
Q. Thank you, sir.
Finally, Richard A. Buss testified. When asked if he remembered anyone mentioning a polygraph test during the juror's deliberations, he stated that "There was a piece of paper that had polygraph written on it that the Defendant, I believe, had signed waiving his rights that we had in the jury room." While Buss could not identify State's Exhibit No. 6 for identification, he did remember "reading something that Garrett signed that said that he would submit to taking a lie detector test."
The trial court related for the record that the envelope containing the exhibits introduced into evidence in this case was brought to the court some time after completion of the trial. In the presence of attorneys for the state and defense, the envelope was opened; inside was State's Exhibit No. 6 for identification. It was not known or determined when the document was placed in the envelope. On May 29, 1986, the trial court denied the motion for a new trial.
It is well settled that neither the fact of the taking of a polygraph examination or the results of such an examination are admissible into evidence. Pennington v. State, 437 So.2d 37, 40 (Miss. 1983); Jordan v. State, 365 So.2d 1198, 1204 (Miss. 1978); Harrison v. State, 307 So.2d 557, 562 (Miss. 1975); Mattox v. State, 240 Miss. 544, 128 So.2d 368, 373 (1961). The supporting argument for inadmissibility is the idea that it is relevant to establish neither consciousness of guilt, nor an attitude of innocence. If the fact that an accused volunteered to subject himself to polygraph testing is revealed, it may be self serving and destroy any value motivation, particularly if the accused knows that the test results are inadmissible. 95 A.L.R. 2d 820, 821 Lie Detector Test  Willingness. However, to permit a jury to hear that the accused voluntarily submitted to a polygraph test, without giving the results, may also work a prejudice to the accused. The jury most likely would draw unwarranted inferences as the guilt or innocence of the defendant. Commonwealth v. McKinley, 181 Pa.Super. 610, 123 A.2d 735 (1956). Thus, the rule of inadmissibility has valid supporting analysis.
When, however, the rule as to admission is violated, the courts have generally looked to the nature of the error and the circumstances attendant to its disclosure. Id., 123 A.2d at p. 821. It has been suggested that an unwillingness to take a polygraph test might be held to be a violation of a defendant's constitutional right against self incrimination; however, the Tennessee Court rejected this argument. Marable v. State, 203 Tenn. 440, 313 S.W.2d 451 (1958). This Court has held that the mere mention of the failure to submit to polygraph testing could not be reversible when compared to the other evidence placed before the jury. Stringer v. State, 454 So.2d 468 (Miss. 1984). However, the improper disclosure of a refusal to submit to testing in a close factual case was held to be prejudicial error in Mills v. People, 139 Colo. 397, 339 P.2d 998 (1959), concluding that the disclosure would tip the results against the defendant this Court has also held that the defense's failure to timely object, hoping for a favorable answer, would not be reversible error. Pennington v. State, 437 So.2d 37 (Miss. 1983).
In the case at issue here, the State contends that since no one could state when State's Exhibit No. 6 for Identification was placed in the evidence envelope, its presence in the evidence envelope does not show that it was viewed by the jury. It was possible that someone put the exhibit in the envelope after the trial concluded in the course of gathering the documents from the trial for storage.
At the hearing on the motion for a new trial, the testimony from the three jurors did not evidence any certainty of what exhibits went to the jury room. Although there was testimony evidencing their knowledge of the defendant's willingness to take the polygraph test, their testimony evidenced only a brief mention of the fact in jury deliberation and not prolonged discussion; *1331 the record did not evidence that there was any overreaching influence on their verdict that worked any prejudice to the defendant. The trial judge overruled the motion for a new trial summarily.
This case is controlled by Stringer v. State, supra, where the mere mention of a refusal to submit to testing was not considered to be reversible error.
This Court, therefore, concludes that although a mistake apparently occurred in permitting State's Exhibit 6 For Identification to go to the jury room, and although error, it was not prejudicial requiring reversal under the facts and circumstances of this case.

IV.

WAS THE JURY VERDICT CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE?
Recently in McFee v. State, 511 So.2d 130 (Miss. 1987), this Court repeated its standard of review for challenges to the legal sufficiency of evidence.
When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. We proceed by considering all of the evidence  not just that supporting the case for the prosecution  in the light most consistent with the verdict. We give the prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge are required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fairminded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb. See e.g., Gavin v. State, 473 So.2d 952, 956 (Miss. 1985); May v. State, 460 So.2d 778, 781 (Miss. 1984).
McFee at 133-134. See also Winters v. State, 449 So.2d 766 (Miss. 1984).
This Court will not order a new trial "unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice." Groseclose v. State, 440 So.2d 297, 300 (Miss. 1983). Factual disputes are properly resolved by the jury. Temple v. State, 498 So.2d 379, 382 (Miss. 1986).
Garrett asserts that the only conceivable cause of Thomas' death was suicide. However, this assertion ignores the following testimony:
(1) Garrett and Thomas had an on-going quarrel which lasted throughout the day and night of August 11, 1983;
(2) Garrett had threatened Thomas' life on a previous occasion;
(3) Garrett hit Thomas with brass knuckles;
(4) Despite his testimony to the contrary, Garrett was in the house at least one time after he left the house for his truck;
(5) Thomas was not seen in possession of Garrett's handgun;
(6) The handgun which killed Thomas was normally kept in Garrett's truck; and
(7) Garrett gave three different statements about the events of August 11-12, 1983, and in one of those he said that he struggled with Thomas for the weapon.
(8) The entry and the path of the bullet would have been difficult for a right handed person.
This evidence, when viewed in the light most favorable to the State supports the jury's verdict. Norman v. State, 385 So.2d 1298, 1300-01 (Miss. 1980); Gathright v. State, 380 So.2d 1276 (Miss. 1980). The jury rejected the defendant's version of the facts. This assignment of error, therefore, is without merit.
This conviction of manslaughter should be affirmed.
AFFIRMED.
*1332 ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, SULLIVAN, ANDERSON, and BLASS, JJ., concur.
PITTMAN, J., not participating.