LEE, J.,
for the Court:
¶ 1. Trumel Keith Cox was convicted of the rape and kidnapping of A.B. in the Circuit Court of Yazoo County on December 4, 1997. He appeals asserting that the *451 trial court erred in: 1) sustaining the State’s objection to the introduction of a “supplemental report” and testimony of Wade Woods, who was a deputy with the Yazoo County Sheriffs Office, to impeach the testimony of A.B.; and 2) denying his motion for a new trial or alternatively for a judgment not withstanding the verdict. Finding that Cox failed to lay a proper predicate for impeaching A.B. and that the verdict was supported by the evidence, we affirm.
FACTS
¶ 2. The facts in this case are not complex, but the accounts of the witnesses differ with one another to varying degrees. It is certain that on the night of March 2, 1995, A.B. and her cousin C.D. encountered Cox. It is also certain that on that night, or early the following morning, A.B. and Cox had sexual intercourse. A.B. contended that she was raped by Cox, and Cox contended that she consented.
¶ 3. Despite conflicts in the testimony of the various witnesses, the following facts were agreed upon. Sometime during the night of March 2, 1995, A.B., C.D., and Cox encountered one another either at a club called Lisa’s Lounge or a convenience store. They then drove about the Yazoo City area in two separate vehicles, one of which belonged to Cox and the other to A.B. The three people switched between the two cars, with different combinations of drivers and passengers at various times, and at some point in time picked-up and then dropped-off a fourth person named James Turner, Jr. Cox’s car broke down, so they pushed it to Cox’s father's garage, and then drove to C.D.’s mother’s house where they socialized for some time, perhaps an hour or an hour and a half. A.B. and Cox left C.D.’s mother’s house and went to her car. A.B. testified that she did so because she and C.D. were going to drive Cox to his home, but before C.D. joined them in the car, Cox locked the doors and drove off thereby kidnapping her, and that he later raped her. Cox testified A.B. consented to having sexual intercourse and only accused him of rape after she learned that her boyfriend was looking for her that evening.
1. WOODS’S TESTIMONY AND THE “SUPPLEMENTAL REPORT”
¶ 4. Cox sought to call and question deputy Wade Woods of the Yazoo County Sheriffs Office concerning comments he overheard A.B. make that presumably conflicted with her testimony at trial and/or a previous statement she gave shortly after the attack. The trial court ruled that because A.B. made these comments during a polygraph examination they were inadmissible. Cox contends that this was error.
¶ 5. For some reason not fully disclosed by the record, Cox was not tried for this crime until December of 1997 even though it was alleged to have occurred on March 2nd and 3rd of 1995.[1] However, it is clear that both Cox and A.B. underwent polygraph examinations during 1997 prior to this action being prosecuted, and Woods assisted in administering a polygraph examination to A.B. on June 19, 1997. In discussing whether Woods’s testimony was admissible, the prosecuting attorney said:
Mr. Rushing: Deputy Woods did not take any statement from the victim in this matter.... [H]e watched the polygraph examination on TV, on a TV from a separate room, and made some notes as to that examination, what the examiner was asking.... [Pjrior to the polygraph exam, someone familiar with the case, which in this case, was Deputy Woods, familiarizes the examiner with the facts of this case. And then he goes in another room and observes the examination on a monitor but live as it occurs. Then after the examination, the examiner confers with him on her responses. And it was during the conference and in *452 writing, to supplement the case file, discrepancies in the version of events she had related to sheriffs investigator in ’95 as to salient facts in the case and the way she had responded as to these factual situation her statement in June ’97.
The Court: So this statement has nothing to do with him doing an independent investigation of the alleged facts of this case, only his observations of the questions asked from a polygraph exam? He did no independent -
Mr. Rushing: He was the investigator at the time.
The Court: He did no independent investigation of the facts himself?
Mr. Rushing: He did take the defendant’s statement for the sheriffs department as an investigation of April the 7th of ’97. More or less, this case was handed to him by the sheriffs department.
The Court: And what he did was the defendants’s statement. Is that separate from the supplemental statement. Is that -
Mr. Rushing: That’s separate, yes, ma'am.
The Court: Then the statement made by Officer Woods while observing the parties during a polygraph exam, in that the polygraph is not admissible, certainly his statement while observing them during a polygraph examination is not admissible.
¶ 6. Upon appeal, Cox acknowledges that results of polygraph examinations are in-admissable to determine whether the person examined is in fact telling, or not telling, the truth. See, e.g., Weatherspoon v. State, 732 So.2d 158 (¶ 12-14) (Miss.1999); Pennington v. State, 437 So.2d 37, 40 (Miss.1983). Nevertheless, in his brief he contends he should have been allowed to question Woods and introduce his “statement” for the purpose of impeaching A.B.’s testimony, and he contends that “Woods’s supplemental report was based on observations and monitoring of A.B.’s interview with Detective Robert Reyna, Jr. which occurred prior to the administration of the polygraph test.”
¶ 7. This argument is misleading as to how the trial was actually conducted. A.B. was called as a witness for the State, and during her cross-examination no specific mention of Woods’s statement was made either to her or the court. After she had been dismissed, and shortly before the State rested, Cox’s attorney approached the trial court and said:
Your Honor, I’m just taking this opportunity, because the jury is out to the courtroom rather than have them brought in and taken back out, but we, the defense intends to call as its first witness Deputy Wade Woods.... Woods prepared a written supplement to the Yazoo County Sheriffs Office case file in this matter, as a result of witnessing the polygraph examination of the victim, the alleged victim in this case, (emphasis added)
This was the first mention of Woods’s statement. At trial, Cox never intended to use the statement to impeach A.B. because she had already been excused at this time. Rather, Cox sought to introduce this statement through its maker, Woods, for the truth of the matters asserted in it. Nevertheless, upon appeal, he asserts it was error not to allow him to use the statement for impeachment purposes. Moreover, the first mention that Woods learned of A.B.’s comments while overhearing another statement she gave outside of the polygraph examination is in Cox’s brief. Additionally, while the motion for a new trial or judgment notwithstanding the verdict states that a copy of the statement was attached as an exhibit, that exhibit was not made part of the record. A rule of appellate review is, “[i]n the absence of anything in the record appearing to the contrary, the (Mississippi Supreme) Court presumes the trial court acted properly.” Moawad v. State, 531 So.2d 632, 635 (Miss.1988) (citations omitted). See also Blue v. State, *453 674 So.2d 1184, 1212 (Miss.1996); Jenkins v. State, 483 So.2d 1330, 1332 (Miss.1986).[2]
¶ 8. Moreover, even if this court addressed the issue of whether or not A.B.’s statement given during a polygraph examination was admissible for impeachment purposes, it would be without merit because Cox failed to lay a predicate for impeaching A.B.’s testimony. Cox asked A.B. if she gave a statement to Woods, and she denied doing so. Cox admits in his brief that this was a truthful answer. Cox asked A.B. “[H]ave you given any other statements.” She answered, “[N]o, I haven’t.” Cox went no further. He never specifically identified to whom this other statement was given, nor did he specifically ask her about the statement or make a proffer as to what the inconsistencies were.[3] M.R.E. 613(b) requires that “[e]x-trinsie evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same.... ” See also Hall v. State, 691 So.2d 415, 420 (Miss.1997) (citations omitted); Ivy v. State, 641 So.2d 15, 19 (Miss.1994). Because Cox failed to lay a proper predicate, any impeachment value of a prior inconsistent statement A.B. gave to anyone other than Woods was improperly presented to the trial court and not preserved for appeal.
2. MOTION FOR A NEW TRIAL OR JNOV
¶ 9. A motion for a peremptory instruction or judgment notwithstanding the verdict is properly denied when credible evidence could lead reasonable jurors to return the verdict. May v. State, 460 So.2d 778, 780-81 (Miss.1984). See also Jenkins v. State, 483 So.2d 1330, 1332 (Miss.1986); Groseclose v. State, 440 So.2d 297, 300 (Miss.1983). In reviewing the sufficiency of the evidence, an appellate court must give the State the benefit of all favorable inferences that may have been drawn by the jury. May v. State, 460 So.2d at 781 (Miss.1984). See also McFee v. State, 511 So.2d 130, 133-34 (Miss.1987); Garrett v. State, 549 So.2d 1325, 1331 (Miss.1989). A motion for a new trial is addressed to the trial court’s discretion and may be granted in the interest of justice or where the verdict in contrary to the overwhelming weight of the evidence. Neal v. State, 451 So.2d 743, 760 (Miss.1984) (citing Uniform Criminal Rules of Circuit Court Practice 5.16).[4] See also May, 460 So.2d at 781. An appellate court will not disturb a trial court’s denial of a motion for a new trial, unless “the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand would be to sanction an unconscionable injustice.” Groseclose, 440 So.2d at 300.
¶ 10. A.B. testified that she was a resident of Jackson, Mississippi and had driven to Yazoo City to take a relative home, and because it was late she decided to stay the night at C.D.’s mother’s house. She did not have any money with her and was hungry, so she and C.D. went to look for her father at a club called Lisa’s Lounge in, or nearby, Yazoo City, and there they encountered Cox, whom she knew casually. Cox accompanied the two ladies as they left the club, and C.D. drove Cox’s sports car, with Cox riding in the passenger seat, and A.B. followed separately in her car. They stopped at a convenience store, where C.D. got into A.B.’s car, and they left to go to A.B.’s aunt’s *454 house with Cox following in his car. On the way there, Cox picked up a friend of his known to A.B. only as “Red,” who was in fact James Turner, Jr. Somewhere along the way, Cox stopped and said C.D. had damaged his clutch, so A.B. used her car to push Cox’s car to a garage owned by Cox’s father. “Red” departed their company at the garage, and A.B., C.D., and Cox proceeded to the aunt’s house. They stayed there some unspecified time, after which the two ladies planned to drive Cox to his home. A.B. and Cox went out to her car where at first she got into the driver’s side and he into the passenger’s side, but she got out of the car and went back inside the house to ask why C.D. had not yet come out, and when she returned Cox was behind the driver’s wheel. She got into the passenger’s side believing C.D. was going to join them, but C.D. was again delayed. At this point in time, Cox locked all the doors of the car and backed quickly down the driveway. A.B. tried to signal C.D. who was just then coming out of the house, but C.D. apparently did not understand the gravity of the situation. Cox drove around for an unspecified amount of time, and A.B. asked him to take her back, but he refused. At some point she escaped from the car and slipped, losing a shoe and her glasses, but Cox caught her, put her in the car’s backseat and after threatening to kill her, raped her.
¶ 11. A.B. further testified that Cox then drove to the house of his uncle, Napolean McGinnis. This house apparently had four rooms all aligned in a row. Cox asked McGinnis if they could stay for the night, and McGinnis let them use the front two rooms. A.B. asked McGinnis if she could use the phone, and she called her cousin’s house where she and Cox had been earlier. She spoke with E.F., who was C.D.’s sister. McGinnis and Cox left the room, and A.B. told Afi she was afraid but not to call the police. Cox re-entered the room and took the phone away and spoke to Afi, assuring her everything was fine. Sometime after hanging up, Cox fell asleep, and she remained sitting up. Sometime thereafter, McGinnis came in, told her the police had called asking if someone was being held in his house against their will and asked if she was okay. She told him that she had been raped, and had lost her eyeglasses and one of her shoes. He then drove her in his truck and helped her find her shoe and eyeglasses. When they returned, the police were at McGinnis’s house, and she was taken to the hospital. At the conclusion of her direct examination, she testified both that neither she nor C.D. drank any alcohol during the evening or early morning hours, and that although she did not see Cox drink any alcohol she smelled some on his breath during the attack.
¶ 12. C.D.’s testimony agreed with A.B.’s on most points, except that she stated A.B. did not know Cox prior to encountering him at the club on March 3, 1995, and at the club he appeared to be intoxicated. Unlike A.B., C.D. also testified that Cox could be seen drinking alcohol throughout the evening, and she stated that A.B. had seen him doing so. However, the majority of her testimony agreed with A.B.’s testimony. She agreed that after driving around Yazoo City, she, A.B., and Cox went to C.D.’s mother’s house and socialized for over one hour. C.D. and A.B. were going to drive Cox home, and A.B. and Cox went outside the house, and before C.D. joined them, she heard the car start and saw Cox driving it quickly down the driveway. She was concerned, so she waited for A.B. to come home and sat up in a chair where she fell asleep, until her sister, E.F., woke her saying A.B. had called on the telephone.
¶ 13. E.F. testified that she saw Cox backing quickly down the driveway, and A.B. was sitting in the passenger seat with a “funny” expression. This gave E.F. a “strange” feeling, but even though she was concerned she did not do anything because she knew they had been out that evening. Around 2:30 a.m., E.F. answered the ringing of the phone, and spoke with A.B., who *455 said she was at a house with Cox and scared, but she thought someone would kill her if E.F. called for help. Cox then spoke to E.F. and said they were returning to the house where E.F. and C.D. lived with their mother. A.B. then came back on the telephone, and E.F. told her she was going to call the police unless they arrived within five minutes. After disconnecting, she obtained the telephone number that A.B. had called from by dialing “ *69” and minutes later called the police to report A.B. was being held against her will at that location.
¶ 14. McGinnis testified that Cox came by the house sometime after midnight, in the early morning of March 3, 1995, and asked if he and his “friend girl” could stay the night. McGinnis agreed and allowed them to use the front rooms of his house, and went to bed. An unspecified time later, he received a phone call asking if Cox was there and if there was anyone there “being held against their will.” He responded “no” to both questions, but went to investigate. He found Cox asleep and A.B. sitting on “the bed.” He asked her if Cox had “her here against her will, and she started crying and what not.” He asked her why she was still there, and she “said she needed her glasses and couldn’t see.” He then took her in his truck to where she had fallen and helped her retrieve her eyeglasses and shoe that she lost earlier.
¶ 15. Cox testified that he encountered A.B. and C.D. at a convenience store in or nearby Yazoo City, Mississippi sometime around 9:00 p.m. on March 2, 1995. He had known both of the young ladies “for years” and they “used to walk home from school together,” and while they were at the convenience store A.B. told Cox she had had a “crush” on him when she was younger, and he had been aware she had been attracted to him years ago. C.D. wanted to drive his sports car and look for a friend of hers, so C.D. asked him to ride with A.B. to Lisa’s Lounge and wait there with A.B. for her to return with his car after she found her friend. He agreed, and at the club he had a beer and she had “a strawberry daiquiri cooler,” which he paid for, as they waited for C.D. to return. However, despite Cox’s having known the two ladies for years and his recollection of events, throughout his testimony he referred to A.B. as “Shamika,” even though his attorney repeatedly prompted him that he was using the wrong name.
¶ 16. Cox further testified that after they drank their drinks, he and A.B. left the club. After driving several blocks, they came upon his car stalled alongside the road. C.D., whom Cox referred to as “A.B.,” waved at them to stop and said his car had stopped running. His clutch had burned-out, so he asked “C.D. and Shami-ka” to use “Shamika’s” car to push him to his father’s mechanic’s garage. There they met Turner who helped Cox push his car into a position where he would not block the entrance to his father’s business.
¶ 17. Cox additionally testified that during the evening he and A.B. had discussed “getting together,” and she was going to drive him to Jackson, Mississippi when she returned there in the morning, so he bought some fried chicken, and they drove to C.D.’s mother’s house to eat it with the understanding that after they ate, they would leave C.D. there and depart together so they could go find a place where they could have sexual intercourse. Upon leaving C.D.’s mother’s house, Cox and A.B. encountered Turner a second time, and they let him ride with them to a convenience store. After, leaving Turner at the store, they drove to McGinnis’s house, but he was not home. So, they drove to a secluded spot and had sexual intercourse. After which, A.B. got outside of the car to use the bathroom, but she slipped and fell losing her eyeglasses and a shoe.
¶ 18. According to Cox’s testimony, he and A.B. then went back to McGinnis’s house, and at this time McGinnis was at home and said they could spend the night. While at McGinnis’s house, A.B. called C.D.’s mother’s house and learned her *456 boyfriend had been calling on the telephone for her, and upon learning this she began worrying that he would find out she and Cox were with one another. Because she feared her boyfriend would find out about her having sexual relations with him, Cox contended that A.B. had a motive to lie and say he had raped her.
¶ 19. Turner testified for the defense, and he confirmed Cox’s testimony that he encountered Cox twice during the evening and early morning in question. The first time he met Cox, he helped Cox push his car into a parking space near his father’s mechanic’s garage, and at that time Cox was in the company of two women. The second time he encountered Cox was later that evening, and at this time only one woman was with him. On this occasion, they gave him a ride in a car to a convenience store, and during the ride they seemed very friendly towards one another, and the woman’s behavior indicated she was in the car with Cox because she chose to be there.
¶ 20. As Cox points out, there are discrepancies in the witnesses’s testimony as to what occurred on the night of March 2, 1995: whether A.B. and he knew each other prior to then, whether A.B. saw him drinking alcohol, whether A.B. drank alcohol with him, where they actually met each other, and why Turner said she was alone with Cox and appeared happy. Nevertheless, the testimony did provide evidence establishing all elements of the crimes alleged. In reviewing this case, it is apparent that the jury chose to reject his and ■Turner’s testimony. Juries are free to accept and/or reject testimony. Gandy v. State, 373 So.2d 1042, 1044 (Miss.1979). Additionally, in other cases the testimony of a rape victim has been sufficient to uphold a trial court’s denial of a motion for a directed verdict or judgment not withstanding the verdict. See, e.g., Nicholson v. State, 523 So.2d 68, 70 (Miss.1988). In this case, the evidence supported each element of kidnapping and rape, and as such there was no error. Moreover, the weight of evidence pointing towards Cox’s guilt does not show that the trial court erred in denying him motion for a new trial.
¶ 21. THE JUDGMENT OF THE CIRCUIT COURT OF YAZOO COUNTY OF THE CONVICTION OF COUNT I RAPE AND SENTENCE OF TEN YEARS; COUNT II OF KIDNAPPING AND SENTENCE OF TEN YEARS WITH SENTENCES TO RUN CONCURRENTLY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO YAZOO COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, COLEMAN, DIAZ, IRVING, PAYNE, AND THOMAS, JJ., CONCUR.

. Cox does not raise any issue going to whether this delay in trial violated any of his rights secured under the United States Constitution or the Mississippi Constitution.

.While the State's brief advances this argument that Cox is barred from asserting Woods’s statement arose from something other than the polygraph examination, the State fails to cite any legal authority for this position. Counsel are urged to support their positions so that issues are not waived. See, e.g., Gerrard v. Mississippi, 619 So.2d 212, 216 (Miss.1993).

. Since Cox failed to place the statement into the record exactly what these details were is uncertain. However, Cox never contended at trial or in his brief that A.B. ever recanted her claim that he raped her.

. Now promulgated at Uniform Circuit and County Court Rule 10.05.