936 So.2d 447 (2006)
Louis Edward BROWN, Appellant
v.
STATE of Mississippi, Appellee.
No. 2004-KA-00432-COA.
Court of Appeals of Mississippi.
August 15, 2006.
*450 William E. Goodwin, attorney for appellant.
Office of the Attorney General by Jacob Ray, attorney for appellee.
Before LEE, P.J., SOUTHWICK and ISHEE, JJ.
LEE, P.J., for the Court.

PROCEDURAL HISTORY
¶ 1. On January 30, 2004, a jury in the Pike County Circuit Court found Louis Brown guilty of the crimes of murder and first degree arson. Brown was sentenced to serve twenty years on the first degree arson charge and a term of life on the murder charge, both to be served consecutively in the custody of the Mississippi Department of Corrections. Brown was also ordered to pay attorney's fees, court costs and a $5,000 fine to the Crime Victims' Compensation Fund. Brown filed a motion for a judgment notwithstanding the verdict or, in the alternative, a new trial, which the trial court denied. Aggrieved, Brown now appeals to this Court asserting the following points of error: (1) the trial court erred in failing to suppress Brown's statement; (2) the trial court erred in failing to grant a continuance when new evidence was discovered; (3) the victim's medical records were admissible; (4) there was evidence of prosecutorial misconduct; (5) the trial court erred in refusing to allow him to cross-examine Officer Perryman about his investigation into Melvin Addison, the victim's estranged husband; (6) the trial court erred in allowing Officer Randy Perryman to give testimony concerning fingerprint evaluations; (7) he was denied effective assistance of counsel; (8) the jury verdict was against the overwhelming weight of the evidence; and (9) the cumulative error in the above issues necessitates a new trial.
¶ 2. Finding no error, we affirm.

FACTS
¶ 3. On the morning of August 26, 2002, a mobile home located in Magnolia, Mississippi, was discovered burning. Shandolyn Addison's burned body was found face down directly outside the mobile home. An autopsy revealed that Addison died from blunt force trauma to the back of her head and not from smoke inhalation. Investigators also determined that the fire was intentionally set inside the mobile home. Addison lived in the mobile home with Brown.
¶ 4. A witness, Emma Love, testified that, around the same time of the fire, she saw Brown sitting in her old abandoned car. Love stated that Brown sat in her car for a few moments before running away. The police later found a red gas can inside Love's car.
¶ 5. Addison's father, Melvin Cook, worked with Brown and testified that the red gas can belonged to him. Cook also testified that Brown had borrowed the gas can on numerous occasions and had access to it on the day of the fire. Cook stated *451 that he had heard Brown say he would destroy Addison and the trailer if Addison ever left him.

DISCUSSION

I. DID THE TRIAL COURT ERR IN FAILING TO SUPPRESS BROWN'S STATEMENT?
¶ 6. In his first issue on appeal, Brown argues that the trial court erred in failing to suppress his statement to the police. Specifically, Brown claims that because of his low IQ he did not have the capacity to waive his rights in a knowing and intelligent manner. A statement by a defendant is admissible if the defendant was given a Miranda warning, and then knowingly, intelligently and voluntarily waived his rights. Busick v. State, 906 So.2d 846, 855(¶ 16) (Miss.Ct.App.2005) (citing Moore v. State, 493 So.2d 1301, 1303 (Miss.1986)). Whether there was an intelligent, knowing and voluntary waiver must be determined from the totality of the circumstances. McGowan v. State, 706 So.2d 231, 235(¶ 12) (Miss.1997). Furthermore, the standard of review for a trial court's decision to admit or exclude evidence is abuse of discretion. Graves v. State, 492 So.2d 562, 565 (Miss.1986).
¶ 7. Prior to signing a Miranda waiver of rights form, Brown was advised of his rights and informed Officer Randy Perryman that he understood his rights. Brown then answered questions concerning the fire and Addison's death. At no time during his statement did Brown ever admit to committing either murder or arson. In fact, Brown was adamant that Addison was about to take a shower at their mobile home when he smelled smoke, confirmed that Addison also smelled smoke and then left the house.
¶ 8. Approximately one year after the murder and arson, Brown underwent a court-ordered psychological examination conducted by Beverly Smallwood, Ph.D. After the exam, during which Dr. Smallwood conducted tests to determine Brown's IQ, Dr. Smallwood concluded that Brown was competent to stand trial. Dr. Smallwood further concluded that, at the time of the crimes, Brown was capable of distinguishing between right and wrong. As Brown had previously been convicted of a felony, she found he exhibited knowledge of how trials work. Dr. Smallwood's test results showed Brown functioned with a verbal IQ of 66, a performance IQ of 68, and a full scale IQ of 64. According to Dr. Smallwood's report an average full scale IQ score is 70 or higher. In her report, Dr. Smallwood stated as follows: "I do find that this Defendant is able to converse and reason with his attorney. However, I have significant concerns about the impact of his intellectual impairment on his ability to knowingly, intelligently, and willfully assert or waive his rights." Dr. Smallwood determined that no further mental health treatment was necessary. Dr. Smallwood was not called as a witness during trial in order to more fully discuss the results of her examination.
¶ 9. In ruling on Brown's motion to suppress his statement, the trial court found as follows: "He [Brown] was consistent at all times in denial of any involvement. He was at all times coherent and lucid. His thought patterns were very reasonable. Did not appear to be of any diminished capacity. . . ." The trial court also discussed the mental evaluation as follows:
I considered and read Dr. Smallwood's report. And I have confidence in Dr. Smallwood. She is a very competent psychologist. But to have an IQ of 64 or 68 or whatever  there were several numbers given. To have an IQ of that number, Mr. Brown was, his verbal score I think was the highest. And he *452 was, he did very well communicating yesterday, or at least on this tape. He did very well expressing himself. And it just, it didn't appear to me at all that he had diminished capacity, based on what I heard in the tape.
¶ 10. The mental ability of the defendant is but one factor for the trial court to consider when determining whether a defendant's statement is admissible. See Neal v. State, 451 So.2d 743, 756 (Miss. 1984). After reviewing Dr. Smallwood's report, Brown's statement in question and the hearing on the motion to suppress, we cannot find that the trial court abused its discretion in allowing the jury to hear Brown's statement denying involvement in the crimes. This issue is without merit.
II. DID THE TRIAL COURT ERR IN REFUSING TO GRANT A CONTINUANCE WHEN NEW EVIDENCE WAS DISCOVERED?
III. WERE THE VICTIM'S MEDICAL RECORDS ADMISSIBLE?
¶ 11. As Brown's second and third issues relate to Addison's medical records, we will address them together. In his second and third issues on appeal, Brown argues that the trial court erred in refusing to grant a continuance when new evidence was discovered. Specifically, Brown claims that Addison's medical records should have been allowed into evidence as the content of the records was relevant and exculpatory. Apparently, the medical records contained evidence that Addison had been previously treated for gasoline addiction. On January 29, 2004, a few days after the start of the trial, Brown's attorney informed the trial court that he had received information concerning Addison's medical history and sent his investigator, Don Evans, to obtain her medical records.
¶ 12. After much arguing and debate about the admissibility of Addison's medical records, including whether these records were legally obtained, Brown's attorney decided not to use the records. Evidently, Brown's attorney thought the State was going to introduce witnesses to testify that Addison told them Brown was going to kill her. Brown was then going to use Addison's medical records to show that Addison was delusional and a gasoline addict. Brown's attorney stated the following: "If the State will just agree not to call any of these people or offer any of these hearsay statements about what she said that he intended to kill her, then, Your Honor, we don't need the medical records." The State responded that they did not intend to offer into evidence any statements Addison made concerning her fears about Brown. Brown's attorney replied that, "We could have saved an awful lot of time."
¶ 13. As Brown ultimately decided not to pursue the issue of whether the medical records were admissible, we fail to see how he can now claim that he should have been granted a continuance to properly obtain the records or that the trial court should have allowed the records to be admitted anyway. These issues are without merit.
IV. WAS THERE EVIDENCE OF PROSECUTORIAL MISCONDUCT?
¶ 14. In his fourth issue on appeal, Brown argues that there was evidence of prosecutorial misconduct and, thus, he was denied a fair trial. Specifically, Brown asserts that the prosecutor, Danny Smith, threatened Don Evans, the investigator from the Public Defender's Office, with criminal action; asked Addison's family members to assert a medical privilege on behalf of Addison in order to keep out possible exculpatory evidence; and attempted *453 to elicit information that Brown had refused a polygraph exam.
¶ 15. In regards to Smith's threatening Evans with criminal action, the record reflects Smith's statement that he has no intention of instituting criminal proceedings against Evans. Furthermore, Smith stated this after a long and often antagonistic discussion with Brown's trial attorneys, specifically Paul Luckett, concerning the admissibility of Addison's medical records and Luckett's advice to Don Evans to plead the Fifth Amendment while testifying about how Evans obtained Addison's medical records. Also, all these discussions were outside the presence of the jury. We cannot find misconduct in this instance.
¶ 16. In regards to Smith's asking Addison's family members to assert a medical privilege on behalf of Addison in order to keep out possible exculpatory evidence, we fail to see merit in this issue. At no point in the record does Brown object to Addison's daughter, Cashassity Harris, asserting a medical privilege on behalf of Addison. Failure by defense counsel to contemporaneously object to a prosecutor's remark at trial bars consideration of prosecutorial misconduct allegations on appeal. Davis v. State, 660 So.2d 1228, 1255 (Miss.1995). Regardless of Brown's failure to object, Brown ultimately decided not to place the medical records into evidence.
¶ 17. In regards to the comments about Brown's refusal to take a polygraph, Brown's argument is that having the jury hear the word "polygraph" was enough to deny Brown a fair trial. During his testimony, Officer Perryman stated that he went to see Brown in jail to talk with him a second time after the original statement. Officer Perryman stated: "And I asked him about, I say, you know, the last time we talked, you say you would do a polygraph, will you do a polygraph for me." After a brief discussion at the bench, the State changed the line of questioning and the polygraph was not mentioned.
¶ 18. Our supreme court has held the following to be inadmissible: testimony pertaining to a witness's refusal or offer to take a polygraph; the fact that a witness took a polygraph; or the results of a polygraph test. Weatherspoon v. State, 732 So.2d 158, 163(¶ 15) (Miss.1999). However, automatic reversal is not always required; instead, when the rule is violated, "the courts have generally looked to the nature of the error and the circumstances attendant to its disclosure." Garrett v. State, 549 So.2d 1325, 1330 (Miss.1989). Under the facts and circumstances of this case, we cannot find that any error occurred. Officer Perryman's statement concerning the polygraph was not elicited by the State; rather, Officer Perryman was testifying as to his procedure upon interrogating Brown a second time.
¶ 19. We find no proof of prosecutorial misconduct; thus, this issue is without merit.
V. DID THE TRIAL COURT ERR IN REFUSING TO ALLOW BROWN TO CROSS-EXAMINE OFFICER PERRYMAN ABOUT HIS KNOWLEDGE OF MELVIN ADDISON?
¶ 20. In his fifth issue on appeal, Brown argues that the trial court erred in refusing to allow him to cross-examine Officer Perryman about his knowledge of Melvin Addison. Melvin Addison was the husband of Shandolyn Addison and gave her a ride home hours before her murder. Apparently, Addison and Melvin had been living apart for some time but were still speaking with each other.
*454 ¶ 21. During cross-examination, Brown attempted to elicit information concerning Officer Perryman's background check on Melvin Addison. Brown wanted information concerning possible arrests. The trial court refused to allow this line of questioning, finding that "the criminal record of Melvin Addison has not been shown to be relevant at this time. It may be later, but I sustain the objection to the question at this time."
¶ 22. Later, during Melvin Addison's testimony, this issue resurfaced. Brown again attempted to elicit information concerning Melvin's arrest record. However, at this time, Brown's attorney admitted that Melvin Addison had no assault convictions against Addison. Rather, Melvin's file contained assault charges signed by Addison, all of which had been dismissed. The trial court found "The fact that they are charges and not convictions, and without anything further, I find that they are irrelevant and if they aren't relevant they are so much more unduly prejudicial than probative that they will be excluded under Rule 403." Relevancy and admissibility of evidence are largely within the discretion of the trial court, and this Court will only reverse when that discretion has been abused. White v. State, 742 So.2d 1126, 1134(¶ 29) (Miss.1999). We can find no abuse of discretion by the trial court; thus, this issue is without merit.
VI. DID THE TRIAL COURT ERR IN ALLOWING OFFICER RANDY PERRYMAN TO GIVE TESTIMONY CONCERNING FINGERPRINT EVALUATIONS?
¶ 23. In his sixth issue, Brown argues that Officer Perryman was not an expert on fingerprints and should not have been allowed to testify about obtaining fingerprints. During cross-examination of Officer Perryman, Brown's attorney asked him, "You did not fingerprint that gas can that you found, did you?" Officer Perryman responded in the negative. Brown's attorney also asked him, "Do you have any fingerprints to say that that is my client's gas can?" Officer Perryman again responded in the negative. On redirect, the State asked Officer Perryman to explain why he did not fingerprint the gas can. Officer Perryman responded that he knew Brown worked on yards with Addison's father. He further stated, "And also with material that [the gas can] is made out of. . . ." Brown then objected, stating that Officer Perryman was not qualified to give an opinion on the gas can's material. The trial court overruled the objection, stating that Brown had brought up the subject on cross-examination.
¶ 24. Officer Perryman continued testifying, stating that it would be hard to pull prints off a gas can because of the material. Brown again objected stating that he was not qualified to discuss such matters. The trial court overruled the objection and then asked the State to lay a foundation for Officer Perryman's response, namely that Officer Perryman is trained in taking latent fingerprints and does so on a regular basis.
¶ 25. Brown mainly argues that Officer Perryman should have been qualified as an expert in fingerprints before he could testify on such matters. However, we are unconvinced by this argument as Brown clearly began this line of questioning by asking Officer Perryman about why he decided not to fingerprint the gas can. Furthermore, as one of Officer Perryman's duties as an investigator was to take fingerprints off various objects, it was proper for Officer Perryman to testify as to why he did not take fingerprints on this particular occasion. This issue is without merit.

*455 VII. WAS BROWN DENIED EFFECTIVE ASSISTANCE OF COUNSEL?
¶ 26. In his seventh issue on appeal, Brown argues that he was denied effective assistance of counsel. For a defendant to prevail on a claim of ineffective assistance of counsel, he must prove (1) that his counsel's performance was deficient and; (2) that he was prejudiced by the deficient performance. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Defense counsel is presumed competent. Woodward v. State, 843 So.2d 1, 7(¶ 14) (Miss.2003). "In order to overcome this presumption, the appellant must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Phinisee v. State, 864 So.2d 988, 990(¶ 9) (Miss.Ct.App.2004). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
¶ 27. Brown argues that his trial counsel failed to call Dr. Smallwood to explain the results of her examination; his trial counsel did not understand the proper method of obtaining medical records and the procedures to introduce them into evidence; the medical records should have been proffered to preserve the record for appeal; and trial counsel allowed themselves to be bullied by the State, making them lose control over the case.
¶ 28. Brown claims that the record is clear that his trial counsel lost control of the case, but, after reviewing the entire record, we find Brown's assertion not so clear. The record contains instances of many heated exchanges between the State and Brown's trial counsel, mostly during discussions concerning Addison's medical records. These exchanges clearly show that Brown's trial counsel vigorously defended him, quite the opposite of what Brown alleges.
¶ 29. In regards to the failure to call Dr. Smallwood as a witness, we fail to see how calling Dr. Smallwood to the stand would have changed the outcome of the proceedings. Although Dr. Smallwood expressed concern about Brown's ability to knowingly waive his rights, Dr. Smallwood discussed at length that Brown had a clear understanding of the trial process and knew the difference between right and wrong. The situation might have been different had Brown initially confessed to the crime rather than adamantly proclaim his innocence.
¶ 30. In regards to proffering the medical records, Brown's trial counsel decided not to admit them into evidence after learning their reason for admitting them was moot. Although other attorneys may have made a proffer at that point, in the case at bar, there was still the issue of whether the records were admissible as Addison's daughter had claimed the physician-patient privilege on behalf of Addison. From the record it is clear that a subpoena was issued for the records, but, according to the testimony of the investigator, Don Evans, it is unclear whether these records were properly obtained. Don Evans was asked by the trial court if his response to questioning concerning the procurement of the medical records was going to incriminate him in a crime, to which Evans responded, "It appears so, sir."
¶ 31. Were we to find that Brown's trial counsel was deficient, Brown has still failed to show that this supposed deficient performance prejudiced his defense. This issue is without merit.

*456 VIII. WAS THE VERDICT AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?
¶ 32. In his eighth issue, Brown argues that the trial court erred in refusing to grant a new trial because the jury verdict was against the overwhelming weight of the evidence. "When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." Bush v. State, 895 So.2d 836, 844(¶ 18) (Miss.2005). The appellate court sits as a hypothetical "thirteenth juror." Id. As such, the Court weighs the evidence "in the light most favorable to the verdict." Id. If, in this position, the Court disagrees with the verdict of the jury, "the proper remedy is to grant a new trial." Id.
¶ 33. Brown claims that there was no evidence of his guilt, thus a reasonable jury could not have found him guilty. However, in weighing the evidence in the light most favorable to the guilty verdict, we cannot agree with Brown's claims. From the record it is clear that Brown was the last person to see Addison alive; Brown stated that he was alone with Addison when the fire started; Brown was seen near the scene of the crime; a gas can was found in the abandoned car where Brown had been sitting; there was testimony that Brown had access to this particular gas can and had used it in the past; Brown was heard threatening to destroy Addison and their trailer if she ever left him; there was testimony that the fire was incendiary in nature and had been started inside the trailer; and there was testimony that gasoline was the accelerant. We cannot find that allowing the guilty verdict to stand would sanction an unconscionable injustice; thus, this issue is without merit.
IX. DOES CUMULATIVE ERROR NECESSITATE A NEW TRIAL?
¶ 34. Finding all of Brown's arguments to be without merit, we find no cumulative error that would necessitate a reversal. Therefore, we affirm.
¶ 35. THE JUDGMENT OF THE PIKE COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, FIRST DEGREE ARSON AND SENTENCE OF TWENTY YEARS AND COUNT II, MURDER AND SENTENCE OF LIFE TO RUN CONSECUTIVELY WITH SENTENCE IN COUNT I, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND PAY RESTITUTION OF $5,000 TO THE CRIME VICTIMS COMPENSATION FUND, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PIKE COUNTY.
KING, C.J., MYERS, P.J., SOUTHWICK, IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.