# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-KA-01252-SCT

*SAMUEL AMOS a/k/a SAMUEL M. AMOS, JR.*
*a/k/a SAMUEL M. AMOS a/k/a SAMUEL MARTIN*
*AMOS, JR. a/k/a SAMUEL AMOS, II*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/08/2016 |
| TRIAL JUDGE: | HON. VERNON R. COTTEN |
| TRIAL COURT ATTORNEYS: | LARRY NEAL McMURTRY |
| | P. SHAWN HARRIS |
| | MARK SHELDON DUNCAN |
| COURT FROM WHICH APPEALED: | NESHOBA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: JUSTIN T. COOK |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: KATY GERBER |
| DISTRICT ATTORNEY: | MARK SHELDON DUNCAN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/30/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

EN BANC.

CHAMBERLIN, JUSTICE, FOR THE COURT:

¶1. A Neshoba County jury convicted Samuel Amos of murder following the shooting death of Marquai Kirkland. Amos was sentenced by the Circuit Court of Neshoba County, as a habitual offender, to life without the possibility of parole. On appeal, Amos raises two issues. First, he argues that the trial court erred by refusing his proposed accomplice jury

instruction. Second, he maintains that the trial court erred by denying his motion for a mistrial when the prosecutor referenced a polygraph test. Finding no error, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2. Kirkland lived with his brother James Carter in Philadelphia, Mississippi. On the afternoon of May 20, 2014, according to Carter, Kirkland talked on the telephone with Landon Dupree. Carter testified that Kirkland told Dupree that someone owed him money and that he had to go pick it up. Less than twenty minutes later, between 2:20 and 3:00 p.m., a green Ford Explorer (the "Explorer") drove up in front of the house where Carter and Kirkland were standing outside. Carter maintained that the only identifying feature of the green Explorer was that some molding was missing from the vehicle.

¶3. Carter further testified that he had believed at the time that the driver of the Explorer was a person named Santo because the driver had been to the house once before to cut Kirkland's hair. Carter, though, had not seen the Explorer before that day. Also, Carter testified that there was no question in his mind that Amos drove the Explorer that day. At trial, Carter explained that he initially had referred to the man as Santo because "[t]hat's just what I thought [his name] was," and it "probably was a street name."

¶4. After Amos arrived at the house alone in the Explorer, Kirkland asked him for a ride. Kirkland got into the Explorer through the front passenger-side door, but "jumped out" because he had forgotten something in the house. Carter testified that Kirkland went into the house for about thirty seconds to get a gun. Carter, however, did not see a gun when Kirkland returned from inside. Kirkland returned to the Explorer, and Amos drove away.

2

Carter never saw Kirkland alive again.

¶5.     At trial, Terrance Hunter, Kirkland's relative, testified that Dupree had telephoned Amos to have Amos pick up Hunter because "[t]hey wanted to hit a lick for $600.00." Hunter testified that Dupree had telephoned him also because he "wanted me to ride with them to make sure the lick went straight." Hunter testified that by "lick" he was referring to a drug deal between Kirkland "and a guy from Noxapater" and that the "dude was going to pay [Kirkland] for . . . was going to buy some sort of controlled substance . . . ."

¶6.     Hunter testified that Amos and Kirkland picked him up at about 3:00 p.m., "about 30 to 45 minutes" after Hunter had talked to Dupree. Hunter got in the back seat on the driver's side. At the time, Amos was driving and Kirkland was in the front passenger seat. After Amos stopped at a store to get some cigarettes, he instructed Hunter to drive. According to Hunter, Amos got in the back seat on the passenger side of the Explorer. Amos directed Hunter to the location where the drug deal was to take place and told him to slow down. Before he could slow down, Hunter heard a "boom"—a gunshot from the back of the Explorer—and saw that Kirkland had been struck. Once Hunter stopped the Explorer, Amos pulled Kirkland from the passenger seat and dragged him "to the end of the woods." Amos then returned to the front passenger seat and told Hunter "to drive off." Hunter complied.

¶7.     Later that evening, Marsha Bavetta, a detective with the Philadelphia Police Department, was alerted that a body had been found. Detective Bavetta responded to the scene of the crime and processed evidence until other law-enforcement personnel arrived.

¶8.     Throughout the course of the investigation, law-enforcement officers found the

3

Explorer with a missing window on the front passenger-side of the vehicle. Law-enforcement officers discovered the Explorer at the home of April Brown, who was in a relationship with Amos.

¶9. Multiple DNA samples, collected in the investigation, matched Kirkland's DNA. Investigators submitted a carpet cutting from the front passenger side floorboard of the Explorer to the Mississippi Crime Laboratory for DNA analysis, as the floorboard contained a "large amount" of suspected pooled blood. A swab also was analyzed from a suspected blood stain which was found twenty-four or twenty-five feet from Kirkland's body. At trial, Leslia Davis, a forensic serology and DNA analysis specialist at the Mississippi Forensics Laboratory, testified, without objection, as an expert in DNA examination and evaluation. She testified to a reasonable degree of scientific certainty that it was not possible that the samples submitted contained "blood from somebody other than . . . Marquai Kirkland."

¶10. Glass fragments taken from the scene of the crime also were submitted to the Mississippi Crime Laboratory to be compared to glass fragments found in the Explorer. Without objection, Jason Burchfield, a Mississippi Crime Lab employee, was tendered and accepted as an expert in the field of trace evidence and glass analysis. Burchfield opined that the glass fragments were "consistent with one another" and that it was "very possible" that the fragments came "from the same batch."

¶11. Law-enforcement officers also processed the exterior of the Explorer for fingerprints. Jamie Bush of the Mississippi Forensics Laboratory System was tendered and accepted, without objection, as an expert in the field of latent print examination and comparison.

4

According to Bush, two latent prints matched "a set of known finger prints, rolled finger prints and palm prints of an individual by the name of Samuel Amos, II."

¶12. Based on information that Hunter had admitted to killing someone, Hunter was brought to the Neshoba County Jail from Texas and was questioned. In an initial statement, Hunter denied having any knowledge about Kirkland's murder. According to Detective Bavetta, Hunter asked to talk, but "would not reveal to me what he wanted to tell me because he said he was afraid that he would get framed for everything . . . ." Bavetta left the Philadelphia Police Department in June 2015, prior to Hunter's giving another statement on June 11, 2015 (the "2015 statement").

¶13. Hunter read the 2015 statement in open court:

> I was on Martin Luther King, Jr. when Landon Dupree pulled over and offered me three grams of meth to ride with Samuel [Amos] to do something to [Kirkland]. . . . At first, I said no, then he pulled off and an hour later he called me and he was like . . . I need you to do it. Just drive, that's it. I don't want you to do nothing else. Red's[1] going to . . . handle the rest. Okay. . . . Landon called me and told me Red was looking for me to handle that business. [Amos] came and picked me up. [Kirkland] was already in the truck with him so we went to Spaceway. I got out then [Amos] got out and went in the store. When we came back out, I got in the driver's seat and [Amos] got in the back seat behind [Kirkland]. So we went on and [Amos] was like, pull down this side road. The lick down there waiting. Lick for $600 so when we got on the road, Red as Samuel Amos pulled the trigger and he was like bro, if you say anything, you're going to be the same way. So [Amos] got out of the truck and drug [Kirkland] to the woods and got back in and we got up the road. [Amos] jumped back in the driver's seat and that's when he asked me where I'm going. I told him on Martin Luther King. He dropped me off and that was the last time I saw Samuel [Amos] . . . .

Hunter explained that he initially had claimed that he did not know about the murder because

_____

[1] According to Hunter, Amos was sometimes called "Red," which was his "street name."

he was scared of retaliation: "I was in fear of my life, sir." Hunter stated that he was unaware that Amos was going to kill Kirkland.

¶14. After the investigation and Hunter's 2015 statement, Amos was indicted for the murder of Kirkland as a habitual offender pursuant to Mississippi Code Section 99-19-83. He was tried in the Circuit Court of Neshoba County on July 12 and 13, 2016. The jury found Amos guilty and the circuit court sentenced him, as a habitual offender, to life without the possibility of parole. On appeal, Amos raises two issues. He first argues that the trial court abused its discretion when it denied Amos's tendered accomplice jury instruction. Second, he argues that the trial court abused its discretion when it denied Amos's motion for a mistrial after the prosecutor asked Hunter whether he had taken a polygraph test. Finding no reversible error, we affirm Amos's conviction and sentence.

**DISCUSSION**

**I. Accomplice Jury Instruction**

¶15. After he rested at trial, Amos proposed the following jury instruction:

> The Court instructs the Jury that the law looks with suspicion and distrust on the testimony of an alleged accomplice[]. The Jury should weigh the testimony from alleged accomplices with great care and caution, and look upon it with distrust and suspicion. You, the jury, should determine what weight, if any, you should give that testimony.

In response, the State argued that there was no evidence that Hunter had been an accomplice to the murder. Among other arguments, defense counsel responded that Hunter was "an accomplice before the fact" as he had "talked about getting a phone call from this drug king pin about hitting—putting out a hit on—on the victim." Defense counsel also argued that "it

6

looks like he gave the statement as his plea bargain, basically, to not get indicted." The trial court refused the instruction, stating that "it would be confusing," but allowed defense counsel a "full-bore right to argue that and the jurors can give whatever weight and whatever inference they wish."

¶16. The grant of a cautionary instruction regarding the testimony of an accomplice witness is discretionary with the trial court. *Brown v. State*, 890 So. 2d 901, 910 (Miss. 2004) (citing *Burke v. State*, 576 So. 2d 1239, 1242 (Miss. 1991)). In order to determine whether the trial court abused its discretion, we consider a two-part test. *Id*. "First, it must be determined if the witness was in fact an accomplice. If that prong is met, we determine secondly if the testimony was without corroboration." *Id*. (citations omitted); *see also Williams v. State*, 32 So. 3d 486, 490 (Miss. 2010). We will take each of these questions in turn.

*Accomplice Liability*

¶17. Our prior caselaw—within the context of accomplice instructions—has addressed whether a witness was an accomplice to the crime. We have held that "'[a]n accomplice . . . is a person who is implicated in the commission of the crime,' and will be considered as such 'if the evidence admits a reasonable inference that the witness may have been a co-perpetrator or the sole perpetrator.'" *Brown*, 890 So. 2d at 910 (quoting *Burke*, 576 So. 2d at 1242).

¶18. On appeal, the defense urges us to "focus on what the witness received for his cooperation" and "expand [the] rule concerning a jury instruction on limiting the weight of the testimony by witnesses who were not also indicted." Mississippi law, though, does not

7

require a witness to have been indicted to be considered an accomplice to the crime. *Williams v. State*, 729 So. 2d 1181, 1189 (Miss. 1998) ("It is not necessary for an accomplice to be prosecuted, and [the witness] may be considered to be an accomplice even though she was not prosecuted for her participation or later attempts to obstruct the investigation.").

¶19. Responding to the defense, the State argues that Hunter was a "passive observer" and not an accomplice. *Brown*, 890 So. 2d at 911. We disagree. Unlike the witness in *Brown*, who was only "asked . . . to go for a ride" and held at gunpoint as he was "ordered . . . to drive away from the scene of the crime," Hunter was an intentional participant in the crime. *Brown*, 890 So. 2d at 911.

¶20. Evidence at trial demonstrated that Hunter was an accomplice. In his 2015 statement, which he read in open court, Hunter testified that, prior to the killing, Dupree had, in person, offered him "three grams of meth to ride with Samuel [Amos] *to do something* to [Kirkland] . . . ." (emphasis added). Initially, Hunter refused, but Dupree called him about an hour later and told Hunter: "I need you to do it. Just drive, that's it. I don't want you to do nothing else. [Amos is] going to . . . handle the rest." These statements show that Hunter knew before the fact that Amos intended to do something to Kirkland.

¶21. Regardless of what Hunter knew before the crime, the evidence confirms that Hunter was an accomplice after the fact. Hunter certainly knew Amos's intent when Amos shot Kirkland. Nevertheless, Hunter voluntarily drove Amos away from the crime scene and fled

to Texas instead of notifying authorities of the crime.[2]  Further, when Hunter was returned to Neshoba County as a suspect in Kirkland's murder, he refused to provide the police with any information and continued to conceal Amos's identity as the killer for a year during his incarceration at the Neshoba County Jail.  All of this evidence satisfies the first prong of the test; Hunter was an accomplice to Kirkland's murder.

*Corroborated Testimony*

¶22.    The standard for determining when an accomplice instruction is required is not difficult.  Is there corroborating testimony connecting the defendant to the crime?  If so, the instruction is not required.  If not, an accomplice instruction is required.  It is that simple. *See Williams*, 32 So. 3d at 490 ("Although granting a cautionary instruction regarding the testimony of an accomplice is within the trial judge's discretion, such an instruction is required when the accomplice's testimony is the sole basis for the conviction, and the defendant's guilt is not clearly proven.").

¶23.    Here, Hunter's testimony, other than Amos pulling the trigger, has been substantially corroborated.  Witness testimony connected Amos to Kirkland's murder and corroborated Hunter's testimony.  Carter testified that his brother, Kirkland, left their home in the Explorer with Amos.  According to Carter, this was the last time he saw his brother alive.  Further,

_____

[2] Hunter's fear for his life after Amos murdered Kirkland does not exonerate him from his status as an accomplice to the crime.  While the fear may explain the length of time between the crime and Hunter's 2015 statement, there was no evidence, other than Amos's threat to Hunter, that Amos forced Hunter not to inform the authorities. *Compare Brown*, 890 So. at 911, where the defendant "pulled the gun on" the witness "and ordered him to drive away from the scene of the crime."  There, the *Brown* Court noted that "[t]he prosecution characterized this as an 'assault' on" the witness. *Id*. at 911 n.3.

Detective Bavetta testified that when she showed Carter a copy of Amos's photo on his driver's license, Carter positively identified Amos as the driver of the Ford Explorer.

¶24.	Physical evidence also connected Amos to Kirkland's murder, including fingerprint and glass-fragment evidence.  In addition, the DNA evidence that Kirkland was murdered in the Ford Explorer is also probative, corroborating evidence of Hunter's testimony.

¶25.	While all of this evidence is circumstantial, it is corroborating evidence of Hunter's testimony nonetheless. ***Burleson v. State***, 166 So. 3d 499, 509 (Miss. 2015) ("This Court previously has defined circumstantial evidence as evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact does exist.") (quotation omitted).

*Harmless Error*

¶26.	As set forth above, Hunter's testimony is substantially corroborated in material aspects which connect him to the crime from the beginning.  However, to the extent it might be determined that the trial court committed error by denying Amos's requested accomplice jury instruction, such error would be harmless in this case. *See **Jones v. State***, 203 So. 3d 600, 612 (Miss. 2016) (applying harmless-error analysis where the jury was improperly instructed concerning accomplice testimony).

¶27.	This Court's analysis of accomplice testimony in ***Jones*** is helpful to our analysis of harmless error here.  In ***Jones***, Lamarcus Jones shot and killed Marveo Lane. ***Id***. at 604. Mareno Hubbard was with Jones at the time and "fired a shot into the air, ostensibly to divert the attention of the crowd from Jones." ***Id***. at 605.  Jones argued on appeal that his

10

conviction was against the overwhelming weight of the evidence "because Hubbard's testimony that Jones had been the shooter was motivated by Hubbard's desire for a reduced charge and sentence." *Id*. Hubbard had pleaded guilty to manslaughter and was sentenced to twenty years' imprisonment. *Id*.

¶28. Responding to Jones's argument, the Court observed that:

> "'[T]he uncorroborated testimony of an accomplice may be sufficient to convict an accused. . . .[This] rule is inapplicable in those cases where the testimony is unreasonable, self-contradictory or substantially impeached.'" *Osborne v. State*, 54 So. 3d 841, 846 (Miss. 2011) (quoting *Ballenger v. State*, 667 So. 2d 1242, 1253 (Miss. 1995)). "Only slight corroboration of an accomplice's testimony is required to sustain a conviction." *Osborne*, 54 So. 3d at 847 (citing *Mangum v. State*, 762 So. 2d 337, 342 (Miss. 2000)). "The testimony that must be corroborated is the *part connecting the defendant to the crime*." *Osborne*, 54 So. 3d at 847 (citing *Holmes v. State*, 481 So. 2d 319, 322 (Miss. 1985)). "If the testimony is not corroborated, a cautionary jury instruction is required." *Osborne*, 54 So. 3d at 847 (citing *Williams v. State*, 32 So. 3d 486, 491 (Miss. 2010)).

*Id*. (emphasis added).

¶29. After the Court affirmed the conviction, it found harmless the trial court's refusal of Jones's requested instruction in favor of the State's inaccurate accomplice instruction. *Id*. at 613. The *Jones* Court explained:

> We find, however, that any error in so instructing the jury was harmless, *given that Hubbard's uncorroborated testimony established only that Jones was the shooter.* Other eyewitness testimony corroborated that Jones had participated in Lane's killing prior to and after the shooting, regardless of which participant in the crime pulled the trigger. According to the proof presented, a reasonable jury could find that both Jones and Hubbard were principals.

*Id*. (emphasis added).

¶30. The facts of the case *sub judice* are very similar to those this Court faced in *Jones*.

11

As there was no corroboration that Jones was the shooter, here, there is no direct evidence that Amos was the shooter. In *Jones*, though—as in our case—there was sufficient evidence *connecting the defendant to the crime* so that the conviction was not against the overwhelming weight of the evidence.

¶31. Besides the fact that Amos's conviction is not against the overwhelming weight of the evidence, there is further evidence that allows us "to determine whether the error was harmless "'beyond a reasonable doubt.'" *Smith v. State*, 986 So. 2d 290, 300 (Miss. 2008) (quoting *Neder v. United States*, 527 U.S. 1, 7, 119 S. Ct. 1827, 1833, 144 L. Ed. 2d 35 (1999)).

¶32. At trial, the jury heard testimony that discredited Hunter's testimony. Two defense witnesses testified that Hunter—shortly after Kirkland's murder—had bragged about killing someone. Another defense witness who had met both Amos and Hunter in jail testified that, while incarcerated, Hunter had told him that Hunter "told me, he ain't never seen [Amos] . . . he didn't know who [Amos] was or nothing."

¶33. Besides this evidence, the trial judge—upon refusing the accomplice instruction—gave defense counsel a "full-bore right to argue that and the jurors can give whatever weight and whatever inference they wish." Defense counsel took full advantage of this opportunity. In closing, he argued concerning Hunter:

> So what we do have to seal the deal off here is . . . Hunter. . . . Hunter that was charged with the same murder . . . and held in jail for over a year. . . . Hunter that fled to Texas and stayed gone in Texas for a while before he finally came back here. He's the one that told . . . at least five people in Union that, yeah, I shot somebody. Not me and my partner, or me and my guy, or me and this dude. He says that I shot somebody and he had blood on him.

Spending a majority of his argument discussing Hunter's credibility, defense counsel highlighted the inconsistencies in Hunter's statements to law enforcement and discussed the fact that Hunter admitted to being in the Explorer. Defense counsel also explained the process of plea bargaining to the jury and noted that Hunter was not indicted for the crime, but, instead, was released from jail soon after his 2015 statement. Thus, the jurors knew that Hunter was involved in the crime and had made inconsistent statements in the past to law enforcement.

¶34. In light of the evidence in this case and defense counsel's arguments before the jury, any alleged error in the trial court was harmless. At trial, there was an abundance of circumstantial evidence combined with a properly afforded opportunity for the defense to cast aspersions on Hunter's testimony. Thus, any alleged error was harmless beyond a reasonable doubt.

## II. Motion for Mistrial

¶35. The issue here is whether or not the trial court erred by denying Amos's motions for a mistrial after the prosecutor asked Hunter if he had taken a polygraph test. On appeal, Amos claims that "Hunter's credibility was impermissibly bolstered" by the polygraph question.

¶36. At trial during direct examination, the prosecutor asked Hunter: "[d]id you take a polygraph test?" Hunter responded "[y]es, sir." Amos's counsel objected and moved for a mistrial. The trial court sustained the objection but overruled the motion for a mistrial. The trial court then instructed the jury as follows: "Ladies and gentlemen, when you come to your

deliberations, the matter of the polygraph test, you will not consider that." The trial court later said the following:

> Ladies and gentlemen, let me reinforce what I said in an earlier moment about the polygraph test. It was mentioned and it was no dispositive answer [sic]. Under Mississippi law that is not allowed. So, I reinforce this to tell you that you should not consider that when you consider your verdict.

After the State rested, the defense again moved for a mistrial, which the trial court overruled.

¶37. "Whether to grant a motion for mistrial is within the sound discretion of the trial court. The standard of review for denial of a motion for mistrial is abuse of discretion." *Gunn v. State*, 56 So. 3d 568, 571 (Miss. 2011) (citing *Caston v. State*, 823 So. 2d 473, 492 (Miss. 2002)).

¶38. "This Court has held that 'any evidence pertaining to a witness's offer to take a polygraph [test], refusal to take a polygraph test, the fact that a witness took a polygraph test or the results of a polygraph test is inadmissible at trial by the State or by the defense.'" *Fagan v. State*, 894 So. 2d 576, 580 (Miss. 2004) (quoting *Weatherspoon v. State*, 732 So. 2d 158, 163 (Miss. 1999)). However, "[r]eversal is not automatic upon admission of such evidence," but "what is important is the 'nature of the error and the circumstances attendant to its disclosure.'" *Id.*

¶39. Amos relies on *Fagan*, in which a prosecutor during direct examination "made several references to polygraph examinations" despite a "pre-trial order prohibiting evidence concerning polygraph examinations" and "repeated defense objections." *Id*. at 578. The *Fagan* Court ultimately reversed and remanded as "the jury was . . . allowed to consider inappropriate evidence in a case which was closely balanced before such testimony was

14

elicited." *Id*. at 580.

¶40. This case is wholly unlike *Fagan*, in which the State willfully violated a pretrial order and ignored objections sustained by the trial judge to imply to the jury that its witnesses had passed polygraph tests. Here, the trial court immediately sustained defense counsel's objection to the prosecutor's question to Hunter about whether he had taken a polygraph test. Further, the trial court twice instructed the jury not to consider the evidence in rendering its verdict. Therefore, there is no merit in this issue.

## CONCLUSION

¶41. Hunter's accomplice testimony was corroborated, and any alleged error was harmless beyond a reasonable doubt. Finally, there is no merit to Amos's mistrial argument in regard to the question regarding a polygraph test. For those reasons, we affirm Amos's conviction and sentence.

¶42. **AFFIRMED.**

**WALLER, C.J., RANDOLPH, P.J., COLEMAN, MAXWELL, BEAM AND ISHEE, JJ., CONCUR. WALLER, C.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J., BEAM AND CHAMBERLIN, JJ. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, J.**

**WALLER, CHIEF JUSTICE, SPECIALLY CONCURRING:**

¶43. I agree with the majority's affirmance of the judgment of the Neshoba County Circuit Court. I write separately to address the injection of polygraph tests before the jury.

¶44. Polygraph tests are inadmissible in our courts. *Carr v. State*, 655 So. 2d 824, 836 (Miss. 1995) ("Mississippi law clearly states that polygraph tests and their results are

inadmissible . . . ."); *Garrett v. State*, 549 So. 2d 1325, 1330 (Miss. 1989) ("It is well settled that neither the fact of the taking of a polygraph examination or the results of such an examination are admissible into evidence."); *Pennington v. State*, 437 So. 2d 37, 40 (Miss. 1983) ("The taking of a polygraph examination and the results thereof are not admissible in evidence."). In *Weatherspoon v. State*, 732 So. 2d 158, 163 (¶ 15) (Miss. 1999), this Court drew a bright-line rule that "any evidence pertaining to a witness's offer to take a polygraph, refusal to take a polygraph test, the fact that a witness took a polygraph test or the results of a polygraph test is inadmissible at trial by the State or by the defense." The unambiguous rule leaves no room for even one question on polygraph tests during trial, and, therefore, the prosecution erroneously questioned Hunter as to whether he had taken a polygraph test.

¶45. As the majority correctly observes, though, "[r]eversal is not automatic upon admission of [polygraph] evidence," but "what is important is the 'nature of the error and the circumstances attendant to its disclosure.'" *Fagan v. State*, 894 So. 2d 576, 580 (¶ 10) (Miss. 2004) (quoting *Weatherspoon*, 732 So. 2d at 163 (¶ 15)). In the case *sub judice*, the polygraph test was mentioned once, to which the defense immediately objected. The trial court sustained the objection and instructed the jury to disregard the statement. As a result, the "nature of the error" is not as egregious as in *Fagan*, 894 So. 2d at 580–581 (¶ 12) (finding reversible error where prosecution repeatedly referenced polygraph tests to bolster its key witness).

¶46. However, the "circumstances attendant to [the error's] disclosure" are troubling here because the prosecution directly asked Hunter if he had taken a polygraph test. In most cases

where this Court has found the error harmless, the polygraph evidence was either introduced inadvertently or referenced indirectly. *See Garrett*, 549 So. 2d at 1328–31 (finding harmless the inadvertent disclosure to the jury of a release signed by defendant stating that he had agreed to take a polygraph test); *Pennington v. State*, 437 So. 2d 37, 40 (Miss. 1983) (holding that a question about an officer's training in the use of the polygraph was innuendo and harmless). Directly asking a witness whether he or she has taken a polygraph test is a blatant error.

¶47.   Due to the polygraph test being mentioned only once, along with the trial court's two instructions for the jury not to consider the evidence, the error was harmless. All the same, polygraphs–and any mention of them–should not be used to bolster or attack the veracity of witnesses. Matters of credibility should be left to "the time-tested, time-tried, and time-honored discretion of the judgment of a jury . . . ." *Weatherspoon*, 732 So. 2d at 162 (¶ 14) (citation omitted).

**RANDOLPH, P.J., BEAM AND CHAMBERLIN, JJ., JOIN THIS OPINION.**

**KITCHENS, PRESIDING JUSTICE, DISSENTING**:

¶48.   The majority would hold that the trial court correctly denied Samuel Amos's tendered accomplice testimony jury instruction because it finds that the accomplice's testimony was corroborated. The majority goes on to hold that, even if the accomplice's testimony was *uncorroborated*, the trial court's failure to give an accomplice testimony jury instruction amounted to harmless error. With respect, I disagree. Amos was entitled have the jury instructed on accomplice testimony and the trial court's failure to grant the instruction was

17

not harmless error. I would reverse Amos's conviction and remand the case for a new trial.

¶49.    Amos proposed the following jury instruction:

> The Court instructs the Jury that the law looks with suspicion and distrust on the testimony of an alleged accomplice[]. The Jury should weigh the testimony from alleged accomplices with great care and caution, and look upon it with distrust and suspicion. You, the jury, should determine what weight, if any, you should give that testimony.[3]

The State argued that there was no evidence that Hunter had been an accomplice. Defense counsel responded that Hunter was "an accomplice before the fact" because he had been listed as a suspect in the killing of Kirkland and had given a statement in which he "talked about getting a phone call from this drug king pin about hitting—putting out a hit on—on the victim." While Hunter never was indicted, after he gave his statement, according to defense counsel, a year later, "he's been released from custody." So, according to defense counsel, "it looks like he gave the statement as his plea bargain, basically, to not get indicted." The trial court refused the instruction, stating that "it would be confusing," but allowed counsel a "full-bore right to argue that and the jurors can give whatever weight and whatever

---

[3] Approximately one month after Amos's trial concluded, this Court approved an accomplice testimony jury instruction very similar to the instruction refused in this case:

> During the course of his testimony in this trial, the witness John Doe claimed to have participated with the defendant in [the crime for which the defendant is on trial]. Doe is an admitted accomplice, and, as such, the jury should consider his testimony with great caution and suspicion. The jury is the sole judge of the credibility and the believability of all the witnesses, and it is for the jury to decide how much weight and worth, if any, to give the testimony of the witnesses, including Doe. As you consider Doe's testimony, you may accept such portions, if any, that you deem credible, and reject such portions, if any, that you do not deem worthy of belief.

*Jones v. State*, 203 So. 3d 600, 611-12 (Miss. 2016).

inference they wish."

¶50.     "'Defendants are entitled to have instructions on their theory of the case presented to the jury for which there is a foundation in evidence, even though the evidence might be weak, insufficient, inconsistent or of doubtful credibility . . . .'" *Alexander v. State*, 749 So. 2d 1031, 1037 (Miss. 1999) (quoting *Welch v. State*, 566 So. 2d 680, 684 (Miss. 1990)). An "abuse-of-discretion standard" is applied to the "grant or denial of a jury instruction." *Burleson v. State*, 166 So. 3d 499, 509 (quoting *McInnis v. State*, 61 So. 3d 872, 876 (Miss. 2011)). "The trial court may refuse an instruction which . . . is without foundation in the evidence." *Burleson*, 166 So. 3d at 509 (citing *Heidel v. State*, 587 So. 2d 835, 843 (Miss. 1991)). But "'[w]hen serious doubt exists as to whether an instruction should be included, the doubt should be resolved in favor of the accused.'" *Burleson*, 166 So. 3d at 509 (quoting *Davis v. State*, 18 So. 3d 842, 847 (Miss. 2009)).

¶51.     This Court has held that, "[w]hen determining whether a defendant is entitled to such a cautionary instruction, the trial judge considers whether the witness was in fact an accomplice and whether the witness's testimony was corroborated." *Williams v. State*, 32 So. 3d 486, 490 (Miss. 2010) (citing *Brown v. State*, 890 So. 2d 901, 910 (Miss. 1976)).

¶52.     First, the majority finds that Hunter's testimony was corroborated. In *Jones v. State*, Lamarcus Jones shot and killed Marveo Lane. *Jones*, 203 So. 3d at 604. Mareno Hubbard was with Jones at the time and "fired a shot into the air, ostensibly to divert the attention of the crowd from Jones." *Id.* at 605. Jones, who was convicted of murder and sentenced to life imprisonment, argued on appeal that his conviction was against the overwhelming weight of

19

the evidence "because Hubbard's testimony that Jones had been the shooter was motivated by Hubbard's desire for a reduced charge and sentence." *Id.* Hubbard had pled guilty to manslaughter and was sentenced to twenty years' imprisonment. *Id.*

¶53.    Responding to Jones's argument, we observed that:

> "'[T]he uncorroborated testimony of an accomplice may be sufficient to convict an accused . . . . [This] rule is inapplicable in those cases where the testimony is unreasonable, self-contradictory or substantially impeached.'" *Osborne v. State*, 54 So. 3d 841, 846 (Miss. 2011) (quoting *Ballenger v. State*, 667 So. 2d 1242, 1253 (Miss. 1995)). "Only slight corroboration of an accomplice's testimony is required to sustain a conviction." *Osborne*, 54 So. 3d at 847 (citing *Mangum v. State*, 762 So. 2d 337, 342 (Miss. 2000)). "The testimony that must be corroborated is the *part connecting the defendant to the crime*." *Osborne*, 54 So. 3d at 847 (citing *Holmes v. State*, 481 So. 2d 319, 322 (Miss. 1985)). "If the testimony is not corroborated, a cautionary jury instruction is required." *Osborne*, 54 So. 3d at 847 (citing *Williams v. State*, 32 So. 3d 486, 491 (Miss. 2010)).

*Id.* (emphasis added). In holding that Jones's conviction was not against the overwhelming weight of the evidence, we stated that, while "Hubbard's testimony that Jones was the shooter was not corroborated," "[n]one of the witnesses observed which of the pair was the shooter" and "[t]he testimony adduced at trial corroborated Jones's participation in the murder of Lane." *Id.* at 607 (citing *Osborne*, 54 So. 3d at 847 (citing *Holmes*, 481 So. 2d at 322)).

¶54.    In *Jones*, the issue this Court was addressing in the above-quoted language was whether Jones's conviction was against the overwhelming weight of the evidence. Here, only Hunter's testimony connected Amos to Marquai (Tae) Kirkland's murder; ancillary testimony and evidence merely connected Amos to the vehicle in which Kirkland was killed. Kirkland's brother, James Carter, testified that Kirkland left their home in a green Ford Explorer with

20

Amos. Physical evidence also connected Amos to the Explorer, including fingerprint, DNA, and glass-fragment evidence. But that evidence only partially corroborates Hunter's version of some of the collateral events that were related to the killing of Kirkland; it did not corroborate Hunter's testimony about the manner and means of Kirkland's death. All of that evidence was circumstantial evidence, which this Court has defined as "'evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact does exist.'" *Burleson v. State*, 166 So. 3d 499, 509 (Miss. 2015) (quoting *Keys v. State*, 478 So. 2d 266, 268 (Miss. 1985)).

¶55. Hunter's testimony that Amos shot Kirkland was "the part connecting the defendant to the crime," because his testimony alone moved this case out of the realm of circumstantial evidence and into the realm of direct evidence. Direct evidence includes "'an admission or confession by the defendant to "a significant element of the offense," or eyewitness testimony "to the gravemen of the offense charged."'" *Burleson*, 166 So. 3d at 509 (quoting *Kirkwood v. State*, 52 So. 3d 1184, 1187 (Miss. 2011) (quoting *Mack v. State*, 481 So. 2d 793, 795 (Miss. 1985))). The "gravemen of the offense charged" here is the pulling of the trigger, and the only testimony from anyone who witnessed that event came from Hunter. That was the most important testimony in the trial, and it was uncorroborated.

¶56. The sole question therefore becomes whether Hunter was an accomplice. An accomplice has "been defined by this Court as 'a person who is implicated in the commission of the crime'" such that "'if the evidence admits a reasonable inference that the witness may have been a co-perpetrator or the sole perpetrator the cautionary instruction should be

21

given.'" ***Slaughter v. State***, 815 So. 2d 1122, 1134 (Miss. 2002) (quoting ***Williams v. State***, 729 So. 2d 1181, 1188 (Miss. 1998)). I agree with the majority's analysis: "Hunter was an accomplice to Kirkland's murder." Maj. Op. at ¶ 21.

¶57.   Because Hunter's testimony that Amos shot Kirkland was uncorroborated and because evidence adduced at trial showed that Hunter had been an accomplice in Kirkland's murder, "even though the evidence might be weak, insufficient, inconsistent or of doubtful credibility," Amos was entitled to have the jury instructed on his theory of the case. ***Alexander***, 749 So. 2d at 1037. And even if the trial court entertained serious doubts with regard to whether an accomplice testimony jury instruction was warranted by the evidence presented in this case, any doubt regarding Amos's entitlement to the accomplice testimony jury instruction should have been resolved in Amos's favor. *See* ***Burleson***, 166 So. 3d at 509 (quoting ***Davis***, 18 So. 3d at 847).

¶58.   The majority reasons that, even if Hunter had been an accomplice in Kirkland's murder and even if his testimony was uncorroborated, the trial court's failure to grant Amos the accomplice testimony jury instruction to which he was entitled amounted to harmless error. The majority cites no case which stands for the proposition that failure to give an accomplice testimony instruction *to which the defendant is entitled* amounts to harmless error. In the only case the majority cites on this issue, this Court held that the trial court's refusal of Jones's sought accomplice testimony amounted to harmless error because "eyewitness testimony corroborated that Jones participated in Lane's killing." ***Jones***, 203 So.

3d at 613.[4] The Court was referring to the following eyewitness testimony:

> Tissia Graham, who testified for the State, observed Hubbard and Jones walk past her with guns in hand. She heard three gunshots, after which a white car exited the parking lot, and the pair walked back by "very quickly." Graham did not, however, see who had fired the shots. State's witness Tommy Orr likewise observed Hubbard and Jones walking past him with guns, heard gunshots, and observed the two men walking away from the club "faster." The testimony of Marcus Smith, another State's witness, was consistent with that of Graham and Orr.

*Id.* at 606-607. Accordingly, it did not matter which of the two men pulled the trigger because "[a]ccording to the proof presented, a reasonable jury could find that both Jones and Hubbard were principals." *Id.* at 612. Here, by contrast, apart from the testimony of Hubbard, the accomplice, no testimony corroborates that Amos pulled the trigger. Amos was entitled to have the jury instructed that it should look with suspicion and distrust on Hubbard's testimony.

**KING, J., JOINS THIS OPINION.**

---

[4] To be clear, in *Jones*, the trial court did give an accomplice testimony jury instruction. *Jones*, 203 So. 3d at 609. We held that "the trial court erred in instructing the jury that, in order to disregard the accomplice's testimony, first it had to find the testimony to be uncorroborated and, second that it had to find the accomplice testimony to be unreasonable, self-contradictory, or substantially impeached." *Id.* at 612.